Tina EDWARDS, Plaintiff,

v.

Richard R. PRETSCH, William Leonick, John C. Blauvelt, Gary Cooper, sued in their individual capacities, and Wal–Mart Stores, Inc., Defendants.

No. 00 Civ. 5784(WCC).

United States District Court, S.D. New York.

Jan. 11, 2002.

Law Offices of Michael H. Sussman (Christopher D. Watkins, of counsel), Goshen, NY, for Plaintiff.

Drake, Sommers, Loeb, Tarshis & Catania, P.C. (Mark L. Schuh, of counsel), Newburgh, NY, for Defendants Richard R. Pretsch, William Leonick, John C. Blauvelt and Gary Cooper,

O'Connor, O'Connor, Mayberger & First, P.C. (S. David Devaprasad, of counsel), Albany, NY, for Defendant Wal–Mart Stores, Inc.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Tina Edwards brings the instant action against defendant Wal–Mart Stores, Inc. ("Wal–Mart"), and against defendants William Leonick, Richard R. Pretsch, John C. Blauvelt and Gary Cooper in their individual capacities as police officers for the Town of Newburgh Police Department ("NPD") pursuant to 42 U.S.C. § 1983. Plaintiff asserts claims for: (1) false arrest; (2) malicious prosecution; and (3) coerced confession. Defendants now move for summary judgment as to all claims pursuant to FED.R.CIV.P. 56. For the reasons that follow, defendants' motions are granted in part and denied in part.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed. In February 1996, Wal–Mart hired plaintiff to work as a cashier at its Newburgh, New York store (the "Store"). (Edwards Dep. at 14.) Plaintiff worked for Wal–Mart until her termination in February 1999. Between July 7, 1998 and January 30, 1999 the Store received several bomb threat telephone calls. (Defs.Rule 56.1 Stmt. ¶ 4.) On one such occasion, October 26, 1998, the Store received two threatening phone calls. (Watkins Aff., Ex. 5.) Both calls were received by Wal–Mart employee Bea Toll. (*Id.*) The New York State Police were notified and the subsequent report states, in relevant part, that "[Toll] received a phone call from an unknown male who stated that there was a bomb in the building. Approx. 12 or 13 minutes later the same subject received a second call and the unknown

male stated 'you're not taking this seriously, there is a bomb in the building.' " (*Id.*) Audiotapes were made of the threatening call, but are not in evidence for purposes of the instant motion.

In response to these and other calls, a joint investigation was conducted by the NPD, the New York State Police, the Orange County District Attorney's Office and Wal–Mart's Loss Prevention Department. (*Id.*) As part of this investigation, in January 1999, Wal–Mart set up video surveillance of the pay phones in the Store parking lot and arranged for incoming calls to the Store to be traced to their source. (*Id.* ¶ 5.) The video camera's internal clock was synchronized with the clocks inside the Store and the employees were instructed to note the time of any bomb threats received.

On January 30, 1999, the Store received a single bomb threat call that was traced to a pay phone outside the Store. (*Id.*) Telephone company records revealed that the call was made at 6:40:56 p.m. and lasted ten seconds. (Watkins Aff., Ex. 11.) The telephone records indicate that no other phone calls were placed to the Store from the pay phones outside the Store at or about that time. Wal–Mart also had videotape surveillance of the pay phone area on January 30, 1999. (1/30/99 Video.) The video depicts two persons walking towards the pay phones at 6:42:08 p.m. (*Id.*) The first person, wearing a dark jacket, went to one of the pay phones at 6:42:21 p.m. (*Id.*) The second pay phone was occupied. The second person, wearing light pants, paced near the soda machines adjacent to the pay phones. When the individual using the second pay phone left at around 6:42:44 p.m., the second person went to the vacant pay phone. (*Id.*) Wal–Mart turned over the videotape to the NPD on January 30, 1999. (Watkins Aff., Ex. 13.) The same day, Dale P. Jackson, a

district Loss Prevention supervisor for Wal–Mart, identified the first person on the video as Nadya Palou, another Wal–Mart employee, and the second person as plaintiff. (Jackson Dep. at 7–9.)

On the afternoon of February 5, 1999, officers Blauvelt and Leonick questioned Palou about the bomb threats. (Pl.Rule 56.1 Stmt. ¶ 43.) They read to Palou the contents of the various threatening phone calls and showed her still photographs taken from the January 30, 1999 videotape. (*Id.* ¶ 44.) Palou identified herself and plaintiff in the photographs and eventually confessed to having made several bomb threats. (*Id.* at ¶ 45; Palou Dep. at 29.) Palou also implicated plaintiff in at least one bomb threat call. She stated that on one occasion she asked plaintiff "to stand by the soda machine and make sure—to look out if somebody was coming to use the phone or coming near the phone so I could stop the phone call." (Palou Dep. at 9.) Palou did not recall the date of the call, and further stated that plaintiff assisted her on one or two other occasions. Palou also recalled that on one occasion, after Palou phoned in a bomb threat and "nothing happened," plaintiff called the Store again and said "they're not taking the call seriously." (Palou Dep. at 10.) While Palou did not recall the date, she stated that she believed that call occurred on the same day that plaintiff served as her lookout. (*Id.* at 44–45.) Defendants note the apparent inconsistencies between Palou's deposition statements and her statements to the NPD, and the January 30, 1999 videotape and the audiotapes of prior bomb threats. Defendants state:

> [a]ccording to Palou, on January 30, 1999, plaintiff waited outside for her near the soda machines before Palou came out. Contrary to Palou's account, however, the videotape shows the two figures … walking toward the pay

phone area near one another, with Palou in front. In addition, according to Palou, plaintiff stood near the soda machines the entire time Palou was on the phone. Contrary to Palou's account, however, the videotape shows the light-jacketed figure (identified as Edwards) walking to the vacated pay phone while the dark-jacketed figure (identified as Palou) was still using the pay phone.

After being read the contents of the various bomb calls by Blauvelt and Leonick, Palou claimed that plaintiff had made the "You're not taking this seriously, there is a bomb in the building" call [which was made on October 26, 1998], after Palou first made a bomb threat call and the store was not immediately evacuated. However, according to Palou, plaintiff made the "You're not taking this seriously" call on the same day that she purportedly acted as a lookout for Palou, i.e., January 30, 1999. (Pl.Mem.Opp.Summ.J. at 7–8.)

Officers Pretsch and Leonick went to plaintiff's home at approximately 4:15 p.m. on February 5, 1999 and asked her to accompany them to the police station for questioning about the bomb threats. (Defs.Rule 56.1 Stmt. ¶ 6.) Plaintiff agreed and voluntarily accompanied the police officers to the police station. (*Id.*) After plaintiff arrived at the police station, she was read her *Miranda* rights and signed a waiver card. (Edwards Dep. at 78.) Over the course of the next several hours, plaintiff was interrogated by Leonick and Pretsch. During the course of the interrogation, plaintiff was shown a photograph that appeared to be taken from a videotape of a person smoking a cigarette near the Store pay phones. Plaintiff identified herself as the person in the photograph. (*Id.* at 61–62.) At approximately 9:30 p.m., plaintiff confessed to Cooper in Pretsch's presence to making a bomb threat in which she told Wal–Mart that they "were not heeding my call, what, do you think I'm kidding...." (*Id.* at 92.) Shortly thereafter, plaintiff was placed under arrest and charged with falsely reporting an incident in the second degree and reckless endangerment in the first degree. (Defs.Rule 56.1 Stmt. ¶ 9.) Plaintiff pled not guilty, was taken to the Orange County Jail, and was released on $1,000 bail. The charges against her were eventually dismissed.

The circumstances under which the confession was elicited are hotly disputed. Plaintiff argues that Leonick repeatedly used profanity during his interrogation in an effort to induce her to confess. (Edwards Dep. at 79.) Plaintiff claims that "[Leonick] asked me if I took my son to church every weekend and I said no and he said, you're a no good F-ing mother," and that "he continually told me that I was lying, that I wasn't telling the truth and then he walked out and Detective Pretsch came in and he said, I'm sorry for my partner's way of speaking but he talks this way to everyone." (*Id.* at 84.) In her October 30, 2001 deposition, plaintiff further recounted part of the interrogation as follows:

Q: What did [Pretsch] say?

A: He said the sooner you admit it, you can go home.

Q: What did you say?

A: I said I didn't do it. I'm not going to admit to it. He left. Detective Leonick came back and when he came back he said, well, you know, if nobody can take care of your son we'll have child services come and take your son away from you, this and that, this and that, this and that.

Q: What's this and that?

A: Just mainly telling me that if I didn't cooperate with them they were going to take and make sure that my son was taken away from me because I was lying and they said that they could prove it and when they said—when they brought my son into it it totally got me to the point where I was just like enough already and that's when I said yes, I did it but when I couldn't give them any more information they—he's like, well, why did you do it and I said I don't know. . . .

(*Id.* at 87–88.) Plaintiff further testified that when, in response to such questioning, she stated that her husband was home taking care of her son, Leonick made no response. (*Id.* at 92.) Plaintiff also claims that she was not allowed to leave the interrogation room to smoke a cigarette, and that Leonick requested that plaintiff make an audiotape to be analyzed and that she would be responsible for paying the costs. (Pl.Decl.¶¶ 5, 7.) Plaintiff also stated in her deposition that during the interrogation she was offered pizza, was never denied access to a rest room and never requested an attorney. (Edwards Dep. at 82–83, 101.) Defendants dispute that Leonick used profanity during the interrogation or that he mentioned plaintiff's son. (Leonick Dep. at 30.)

On December 13, 2001, plaintiff submitted a signed declaration in which she claims, for the first time, that the language of the bomb threat call to which she confessed was relayed to her by Leonick and Pretsch prior to her confession. This is in conflict with plaintiff's prior deposition testimony in which she testified as follows:

Q: Now, when you said that you did it, did you say anything else other than I did it?

A: I explained what was on the phone call but that was—I believe that was it.

Q: When you say you explained what was on the phone call, what do you mean?

A: I told them they were not heeding my call, what, do you think I'm kidding and—

Q: Just so we're clear, those were your words?

A. Yes. Right.

(Edwards Dep. at 92.) There is no mention in the deposition that plaintiff was made aware of the content of the phone call prior to the confession, and the subsequent declaration does not contain an explanation for the discrepancy between the deposition and the subsequent affirmation.

Plaintiff does not dispute that no Wal–Mart representative ever questioned or detained her with respect to the bomb threat investigation. Nonetheless, plaintiff argues that Wal–Mart assisted in plaintiff's interrogation. (Wal–Mart Rule 56.1 Stmt. ¶¶ 5–6.) However, while the evidence submitted suggests that Dale Jackson, a Wal–Mart employee, was present at the police station at the time that Palou and plaintiff were being interrogated, his involvement was limited to answering police questions regarding the investigation. (Pretsch Dep. at 42.) Plaintiff does not assert any claims against any individual Wal–Mart employee.

During discovery in the instant action, plaintiff requested that Wal–Mart produce all audiotapes, videotapes and documents concerning any bomb threats made in 1998 and 1999. Wal–Mart subsequently produced the January 30, 1999 videotape and six audiotapes in their possession. None of the audiotapes contained the second bomb threat made on October 28, 1999 allegedly by plaintiff. In his deposition

testimony, Jackson states that to the best of his knowledge, the case file pertaining to the instant case was discarded after Jackson left the Newburgh area and a new district loss manager was hired. (Jackson Dep. at 25.) However, Jackson also states that copies of everything Wal–Mart had in their case file was turned over to the NPD. (*Id.* at 26–27.)

## DISCUSSION

### I. *Standard of Review*

Defendants move for summary judgment pursuant to FED.R.CIV.P. 56. Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ticali v. Roman Catholic Diocese of Brooklyn,* 41 F.Supp.2d 249, 254 (E.D.N.Y.1999). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ticali,* 41 F.Supp.2d at 254. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Silver v. City Univ. of N.Y.,* 947 F.2d 1021, 1022 (2d Cir.1991).

### II. *Qualified Immunity*

As an initial matter, defendants Pretsch, Leonick, Blauvelt and Cooper seek summary judgment on the ground of qualified immunity. As the Second Circuit recently stated in *Cerrone v. Brown,*

[a] police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act.

246 F.3d 194, 199 (2nd Cir.2001) (quotations and citations omitted). With respect to the second element, a police officer is entitled to qualified immunity if "a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions." *Id.* at 202 (quotations and citations omitted). In situations where probable cause is required, this standard requires something less than actual probable cause. This is defined by the Second Circuit as "arguable probable cause," and is described as follows:

Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable. Even on summary judgment, where all facts must be viewed in the

light most favorable to the non-moving party, for the purpose of qualified immunity and arguable probable cause, police officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences.

*Id.* at 203 (quotations and citations omitted).

We will address each of defendants' qualified immunity arguments in connection with our discussion of plaintiff's claims to which they apply.

### A. *Coercion of Confession*

■ Plaintiff alleges that defendants Pretsch, Leonick, Blauvelt and Cooper coerced her confession in violation of her Fifth Amendment right against compelled testimonial self-incrimination. That right attaches during custodial interrogations of a criminal suspect and is violated by the use of a compelled statement against the declarant at any criminal proceeding. *See Weaver v. Brenner*, 40 F.3d 527, 535–36 (2d Cir.1994). The Supreme Court analyzes coercive interrogation techniques under the Due Process Clause. *See Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "The test under the Due Process Clause is whether the suspect's statements were made voluntarily, which depends upon examining all of the circumstances surrounding the interrogation to see if police overreaching overcame a suspect's will and led to an involuntary confession, one not freely given." *Weaver*, 40 F.3d at 536.

■ Assuming for the purposes of this motion that plaintiff was "in custody" for the purposes of the Fifth Amendment at the time of her confession, we must deny defendants' motion for summary judgment with respect to this claim. Plaintiff alleges that she was interrogated for five hours, was verbally harassed, was not allowed to take a break to smoke a cigarette, and that she was threatened that if she did not confess, her three-year-old son could be taken from her care. While defendants hotly contest each of these allegations, and may well prevail at trial, genuine and material issues of fact currently exist as to whether the confession was coerced. Accordingly, defendants' motion for summary judgment with respect to this claim is denied.

■ Defendants' motion for summary judgment on the basis of qualified immunity for this claim is similarly denied. It is clearly established that police officers may not coerce a confession from a criminal suspect. Accordingly, defendants are entitled to qualified immunity only if it was objectively reasonable for them to believe that their actions were lawful. Because plaintiff and defendants dispute the circumstances surrounding the confession, a factual determination of defendants' conduct is necessary before we can decide whether it was objectively reasonable for them to believe that their conduct was lawful. *See Niemann v. Whalen*, 911 F.Supp. 656, 673 (S.D.N.Y.1996) (Conner, J.).

### B. *False Arrest and False Imprisonment*

■ Plaintiff's claim for false arrest implicates the Fourth Amendment right to be free from unreasonable seizures. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 115 (2nd Cir.1995). The elements of a claim of false arrest under § 1983 are "substantially the same" as the elements of a false arrest under New York law. *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir.1992). Under New York law, "a plaintiff claiming false arrest must show, *inter alia,* that the defendant intentionally confined him without his consent and without

justification." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). "There is no 'bright line' rule differentiating an arrest from [other lesser detentions] supportable by less than probable cause." *Posr v. Doherty,* 944 F.2d 91, 98–99 (2d Cir.1991). An arrest occurs when an individual is restrained and his freedom of movement limited to such an extent that he did not feel free to leave. *See id.* Furthermore, for § 1983 purposes, false imprisonment is merely a species of false arrest. *See Singer,* 63 F.3d at 118. "False imprisonment is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false arrest." *Covington v. City of New York,* 171 F.3d 117, 125 (2d Cir.1999) (Glasser, J., dissenting); *see also Bowman v. City of Middletown,* 91 F.Supp.2d 644, 660 (S.D.N.Y.2000).

The existence of probable cause to arrest is a complete defense to a false arrest claim under § 1983. *See Weyant,* 101 F.3d at 852. "Courts evaluating probable cause must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996). Probable cause exists when there are "facts and circumstances sufficient to warrant a prudent man that the [suspect] had committed or was committing an offense." *Id.* (quotations and citations omitted). The probable cause determination is based on the totality of the circumstances at the time of the arrest. *See Calamia v. City of New York,* 879 F.2d 1025, 1032 (2d Cir.1989).

Plaintiff argues that there was no probable cause to arrest defendant on February 5, 1999. For the purposes of this motion, because questions of fact exist as to whether defendants coerced plaintiff's confession, we will not consider the confession in our probable cause determination. Defendants argue that there was sufficient evidence to establish probable cause even if the confession is disregarded. We agree. At the time of the arrest, defendants had the following pieces of evidence:

1. Knowledge that on January 30, 1999, Wal–Mart received a single bomb threat call that was traced to pay phones outside the store.

2. The January 30, 1999 surveillance video depicting two individuals near the pay phones outside Wal–Mart.

3. A telephone log indicating that a call was placed from the same pay phones to Wal–Mart at approximately the same time a bomb threat was placed and at approximately the same time the videotape depicted the two individuals near the pay phones.

4. A confession by Nadya Palou that she made several bomb threats, at least one with plaintiff's assistance in which plaintiff served as a "lookout." Palou also stated that on one occasion where Palou initiated a bomb threat, plaintiff made a subsequent call warning Wal–Mart that they should take the threat seriously.

4. Numerous NPD complaint reports detailing several bomb threat calls, including two on October 26, 1998. The report states that Wal–Mart received a second call and an unknown male stated "You're not taking this seriously, there is a bomb in the building."

5. A statement by Nadya Palou identifying herself and plaintiff in a photograph made from the videotape.

6. A statement by Dale Jackson identifying plaintiff as one of the persons seen in the videotape.

7. A statement by plaintiff, prior to the alleged coerced confession, identifying herself as one of the persons seen in a photograph made from the videotape.

We therefore conclude, as a matter of law, that there was sufficient evidence to establish probable cause to arrest plaintiff without considering the subsequent confession. Plaintiff's argument that the minor factual inconsistencies between the evidence and defendants' theory of the crime should preclude summary judgment is unpersuasive. Admittedly, Palou's statements are vague as to the number and timing of the bomb threats, and the October 1998 police report refers to a single unknown male caller. However, while the evidence may have been unlikely to sustain a conviction, considering the totality of the circumstances, there was sufficient evidence to support a determination of probable cause. Accordingly, defendants' motion for summary judgment dismissing plaintiff's false arrest and false imprisonment claims is granted. Furthermore, defendants Pretsch, Leonick, Blauvelt and Cooper are entitled to qualified immunity with respect to this claim. While the law is clearly established that a lawful arrest requires probable cause, there is no doubt that, based on the evidence at their disposal, a reasonable officer in the defendants' position could reasonably believe he had probable cause to arrest the plaintiff.

### C. Malicious Prosecution

 Plaintiff has also asserted a claim for malicious prosecution against defendants for pressing charges without probable cause. To state a claim for malicious prosecution, plaintiff must establish: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of that proceeding in plaintiff's favor; (3) lack of probable cause for the commencement of the proceeding; and (4) actual malice as the motivation for defendants' actions. *See Rounseville v. Zahl,* 13 F.3d 625, 628 (2d Cir.1994). Even without considering the lack of evidence demonstrating malice, our previous finding that defendants had probable cause at the time to believe plaintiff had committed the charged crimes warrants dismissal of this claim. Therefore, defendants' motion for summary judgment with respect to this claim is granted.

### CONCLUSION

For the reasons stated above, we grant defendants' motions for summary judgment with respect to plaintiff's Fourth Amendment claims for false arrest, false imprisonment and malicious prosecution, including all claims asserted against defendant Wal–Mart. However, we deny summary judgment as to the Fifth Amendment coerced confession claim asserted against defendants Richard Pretsch, William Leonick, John Blauvelt and Gary Cooper.

SO ORDERED.