Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan Vallely, in his individual capacity, Thomas D'Amicantonio, in his individual capacity, James Giglio, in his individual capacity, Michael Moffett, in his individual capacity, and Paul Nadel, in his individual capacity, Defendants.

No. 09 Civ. 7283 (JSR).

United States District Court,
S.D. New York.

Sept. 13, 2010.

James Brian LeBow, Sr., James Brian LeBow, New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

## MEMORANDUM ORDER

JED S. RAKOFF, District Judge.

Pending before the Court are the above-captioned defendants' motions for summary judgment dismissing this case in its entirety.

By way of background, on August 18, 2009, plaintiff Matthew D'Olimpio brought this action under 42 U.S.C. § 1983 and the U.S. Constitution alleging false arrest, unlawful detention, malicious prosecution and various other violations by defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel consequent to D'Olimpio's arrest on November 16, 2007. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added his claim under § 1983 and the Constitution against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement ("BNE"), Metropolitan Area Regional Office ("MARO"). On December 3, 2009, Crisafi filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952)—but was effectively a counterclaim—alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint; and on February 18, 2010, D'Olimpio filed a second amended complaint containing updated allegations relating to the discontinuance of the state criminal charges brought against him. Thereafter, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them; defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim; defendants Nadel, Treacy, Post,

and Dewey moved to dismiss Kaplan's claim against them; and Kaplan moved to dismiss Crisafi's defamation claims/counterclaims against him.

By Order dated March 3, 2010, and by Memorandum Order dated June 15, 2010 (reported at 718 F.Supp.2d 340, 2010 WL 2428128 ("*D'Olimpio I*")), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation claims; and denied all other motions to dismiss.

With Kaplan, Treacy, Dewey, and Post thus removed from the case, discovery concluded and the remaining defendants moved for summary judgment on March 31, 2010, seeking to dismiss all remaining claims. The Court received full briefing on these motions and held oral argument on May 6, 2010. For the following reasons, the Court hereby grants the motions insofar as D'Olimpio's claims are based on allegations that the defendants violated his Fifth Amendment privilege against self-incrimination, but denies the defendants' motions in all other respects.

The Court turns first to the summary judgment motions of defendants Crisafi, D'Amicantonio, and Vallely (the "Investigator Defendants"). These motions are based on the following facts, which are undisputed or, where disputed, taken most favorably to D'Olimpio. The BNE is the state office responsible for combating the illegal use and trafficking of prescription controlled substances, and at times relevant to this action consisted of a central office in Troy, New York, as well as four regional offices, including the MARO, which is located in Manhattan. Pl's [Counter] Statement to Defendants' [Vallely *et al.*] Statement of Material Facts Not in Dispute, 4/23/10 ("Pl's 56.1

Resp. Vallely"), ¶ 1.[1] At times relevant to this action, the Investigator Defendants were employed as BNE investigators and worked out of the MARO in Manhattan. *Id.* ¶¶ 4–5, 10; Pl's Counter Statement to Defendant[ ] Crisafi['s] Statement of Material Facts Not in Dispute, 4/23/10 ("Pl's 56.1 Resp. Crisafi"), ¶ 3. BNE narcotics investigators, including the Investigator Defendants, are Peace Officers who are authorized to make arrests. Pl's 56.1 Resp. Crisafi ¶ 2. At the time of D'Olimpio's arrest, Investigators D'Amicantonio and Vallely served under the immediate supervision of then-Senior Investigator Crisafi. Pl's 56.1 Resp. Vallely ¶¶ 9–10.

The following facts are relevant to the Investigator Defendants' involvement with D'Olimpio's investigation, arrest, and prosecution. Prior to November 15, 2007, Crisafi had received numerous complaints from physicians and pharmacists about a person who would identify himself to pharmacists as "James Avery" and attempt to purchase drugs based on prescriptions purportedly phoned in for "Avery" by someone using doctors' identifying information. These physicians, once contacted, denied calling in or authorizing such prescriptions. *Id.* ¶ 25. On November 15, 2007, Crisafi received a complaint from Louis D'Introno, a pharmacist at a Walgreens pharmacy located at 1328 Second Avenue in Manhattan, that was consistent with previous reports about Avery. D'Introno told Crisafi that someone identifying himself as Dr. Michael Plokamakis, a physician located in Astoria, Queens, had called requesting that his patient, "James Avery," receive fifteen hydrocodone tablets. *Id.* ¶¶ 26–27. D'Introno informed Crisafi that he had contacted Dr. Plokamakis to confirm that prescription,

---

**1.** Citations to D'Olimpio's Local Rule 56.1 counterstatements incorporate the corresponding paragraphs of the defendants Local

Rule 56.1 statements of material facts not in dispute.

at which point D'Introno had learned from Dr. Plokamakis that the prescription was fraudulent and that the person who had called in the prescription was impersonating Dr. Plokamakis. *Id.* ¶¶ 28–29. D'Introno also told Crisafi that he had determined that "James Avery" had fraudulently attempted to retrieve two other prescriptions purportedly called in by Dr. Plokamakis on the evening of November 14 from two other Walgreens pharmacies in Manhattan: one located at 1160 Third Avenue and one located at 145 Fourth Avenue. *Id.* ¶ 30.

According to a Memorandum of Investigation ("MOI") included in the BNE's final investigative report, Crisafi then traveled to the Walgreens located at 1160 Third Avenue to view the store's video surveillance tapes from the evening November 14. The MOI indicates that Crisafi was, with the assistance of the Walgreens pharmacist who sold Avery the prescription, able to identify Avery from the videotape footage. Based on this identification, Crisafi described Avery as a white male of average height and build who had "dark hair with sideburns" and "no distinguishable traits." Decl. of Brendan Vallely, 4/5/10 ("Vallely Decl."), Ex. 3(MOI), at 4; *see also* Decl. of James LeBow, 4/23/10 ("LeBow Decl."), Ex. E (Dep. of Louis Crisafi, 3/15/10 ("Crisafi Dep.")), at 153 ("For some reason, what sticks out about this Avery guy . . . was that he had sideburns.").

Crisafi's account of his identification from the videotape image is corroborated by Stacia Woodcock, a Walgreens pharmacist on duty on November 14, who attests that she filled the "James Avery" prescription that day. Woodcock spoke with Crisafi on November 15, and as noted, Crisafi came to the pharmacy to view the store's video surveillance archive. Woodcock identified for Crisafi the man on the tape who had claimed to be James Avery, whom she describes in her declaration as "a white male in his 20's or 30's, with average height, average build, and dark hair." Decl. of Stacia Woodcock, 4/5/10.

Later in the day on November 15, Crisafi asked Investigator Vallely to assist with his investigation of "James Avery" by going to the Walgreens located at 145 Fourth Avenue, where a man purporting to be Avery had picked up a hydrocodone prescription the day before. Pl's 56.1 Resp. Vallely ¶ 36. Vallely went to that pharmacy and spoke with the store manager, Robert Demeester, who told him that according to cash register records, "James Avery" had purchased a phoned-in hydrocodone prescription at 11:07 p.m. on November 14. *Id.* ¶ 37. The pharmacist who was on duty at the time of that sale was not present, but Demeester cued the surveillance tape to the time of this purchase as indicated by cash register records. *Id.* ¶¶ 39–40.[2] The store pharmacists also provided Vallely with a prescription profile of James Avery based on their store records, which listed Dr. Plokamakis and Dr. Diogenes Almonte as prescribing physicians. Pl's 56.1 Resp. Vallely ¶ 42–43.

At his deposition, Vallely testified that in viewing the videotape, he observed more than one customer pick up prescriptions at the approximate time that Avery's prescription was filled. *Id.* ¶ 41; *see also* LeBow Decl., Ex. B (Dep. of Brendan Vallely, 2/26/10 ("Vallely Dep.")), at 25–28. In his declaration, Vallely attests that he

---

2. Although there was a nine-minute discrepancy between the clock on the surveillance video and the internal clock for the cash register, Demeester attested that he cued the tape to compensate for this discrepancy, as he has done several times in the past to assist with other BNE investigations. *See* Decl. of Robert Demeester, 4/29/10; *see also* Vallely Decl. ¶ 10.

saw a man in that video that he later identified as D'Olimpio, and Vallely also testified to this effect at his deposition. Vallely Decl. ¶ 11; Vallely Dep. at 27. However, there is no indication in the MOI that Vallely viewed a person in the video that he later identified as D'Olimpio. In addition, the record of this case does not contain the surveillance tapes viewed by Crisafi and Vallely or still images of "Avery" derived from those tapes.

Upon returning to his office that day, Vallely contacted Dr. Plokamakis about the hydrocodone prescriptions that he purportedly called in for James Avery. Dr. Plokamakis denied ever having treated a patient named James Avery or filling out a prescription for anyone by that name. Pl's 56.1 Resp. Vallely ¶¶ 44–45; *see also* Vallely Decl., Ex. 1 (facsimile from Dr. Plokamakis confirming this denial).

That same day, Vallely and Crisafi visited Dr. Almonte at his offices at 608 Grand Street in Brooklyn. Pl's 56.1 Resp. Vallely ¶ 46. Upon arriving at the office, the investigators first spoke with Maritza Valentine, Dr. Almonte's office manager. They asked her whether Dr. Almonte had a patient named James Avery, and she said that he did not. Vallely Decl. ¶ 16. Crisafi then provided Valentine with a physical description of Avery from the videos, stating that "he was a white male, of average height and build with dark hair and distinctive sideburns." *Id.* ¶ 17; *see also* Vallely Dep. at 100 (testifying that Crisafi described the suspect's sideburns as "beyond average length"); Crisafi Dep. at 154–55 (testifying that when he gives a description of someone, "it's a head to toe description"); Decl. of Maritza Valentine,

4/5/10 ("Valentine Decl."), ¶ 4 (attesting that Crisafi described "Avery" as a "white male, with average height and build, dark hair, noticeable sideburns, and dressed in business-attire and [carrying] a briefcase"). Valentine immediately responded that that description fit Matthew D'Olimpio, who was one of Dr. Almonte's patients. Vallely Decl. ¶ 17; Valentine Decl. ¶ 5. This interaction between the investigators and Valentine is not included in the MOI.

Next, the investigators spoke to Dr. Almonte. There is some inconsistency in the declarations and deposition testimony with respect to the sequence of this interaction. Dr. Almonte attests that before speaking to the investigators, Valentine presented him with the physical description that she was given by Crisafi, and that upon hearing this description, Dr. Almonte thought it matched D'Olimpio. Decl. of Dr. Diogenes Almonte, 4/5/10, ¶ 3.[3] Thereafter, according to Dr. Almonte, he spoke to the investigators and notified them that he did not have a patient named "James Avery" and had never prescribed drugs to such a person. *Id.* ¶ 4. He "believe[s]" he then told them that the description of "Avery" conveyed to him by Valentine matched D'Olimpio. *Id.* ¶ 5. The MOI indicates that Dr. Almonte also told the investigators that "he never suspected Mr. D'Olimpio of any drug seeking tendencies" and that D'Olimpio's father was a physician who worked in Manhasset, Long Island. MOI at 7.

As the investigators were leaving Dr. Almonte's office on November 15, Valentine informed them that she would contact them the next time that D'Olimpio was present at the office. Valentine Decl. ¶ 6;

---

**3.** According to Vallely's and Crisafi's deposition testimony, however, Crisafi separately described "Avery" to Dr. Almonte based on his identification from the videotape. Vallely Dep. at 118; Crisafi Dep. at 154–55; *see also* Vallely Decl. ¶¶ 18–19. Crisafi testified in his

deposition that he and Vallely spoke to Dr. Almonte before speaking to Valentine, Crisafi Dep. at 154–56, but none of the other declarations or testimony supports this version of the chronology.

Vallely Decl. ¶ 20. Later on that day, Vallely contacted Dr. Plokamakis to see if he had treated D'Olimpio. Dr. Plokamakis responded that he never had a patient by that name, but that he did know a Dr. Thomas D'Olimpio, who was a classmate from medical school. MOI at 8.

On November 16, 2007, Valentine called the MARO to inform the investigators that D'Olimpio had arrived at Dr. Almonte's office for an unscheduled appointment. Pl's 56.1 Resp. Vallely ¶ 52. Crisafi instructed Vallely to meet him in Brooklyn at Dr. Almonte's office, and Crisafi drove to the office along with Investigator D'Amicantonio. *Id.* ¶ 53; Pl's 56.1 Resp. Crisafi ¶ 27. During the car ride to the office, Crisafi briefed D'Amicantonio on the investigation, informing him that he had seen video surveillance footage of an individual believed to have impersonated doctors in order to call in false narcotics prescriptions. Decl. of Thomas D'Amicantonio, 4/5/10 ("D'Amicantonio Decl."), ¶ 8. Crisafi did not provide a description of D'Olimpio to D'Amicantonio. LeBow Decl., Ex. A (Dep. of Thomas D'Amicantonio, 3/12/10 ("D'Amicantonio Dep.")), at 54. By the time that Crisafi and D'Amicantonio arrived outside the office and parked across the street from the office's entrance, Vallely was already there. Pl's 56.1 Resp. Vallely ¶¶ 56–57.

While Vallely was waiting for the other investigators to arrive, he had called Valentine to "verify" D'Olimpio's "physical description," including "what he was wearing" so that he could "communicate that to Crisafi and D'Amicantonio." Vallely Dep. at 132. Vallely further testified at his deposition that he shared D'Olimpio's physical description (including what he was wearing) with Crisafi and D'Amicantonio and that if he had not gotten such a description from Valentine, he would not have been able to recognize D'Olimpio exiting the office. *Id.* at 133–35.

After Crisafi and D'Amicantonio arrived, Valentine called Vallely again when D'Olimpio was exiting the office. Valentine Decl. ¶ 10. Vallely called Crisafi's cell phone to inform him of this information. Vallely Decl. ¶ 24. The investigators attest that they recognized D'Olimpio as the person who claimed to be "James Avery." Crisafi Dep. at 158; Vallely Decl. ¶ 26–27; *see also* D'Amicantonio Decl. ¶¶ 11–12 (recalling that Crisafi said "that's him" when approaching D'Olimpio). Crisafi and Vallely then approached D'Olimpio, who was walking toward a parked car. D'Amicantonio Decl. ¶¶ 11–12; Vallely Decl. ¶¶ 25–27.

The defendants and D'Olimpio present divergent accounts of what happened next. According to the Investigator Defendants, Crisafi and Vallely identified themselves as investigators to D'Olimpio. D'Amicantonio Decl. ¶ 13; Crisafi Dep. at 158. After D'Olimpio asked what they wanted, Crisafi explained that he had observed videotape footage of D'Olimpio purchasing drugs using false prescriptions, and D'Olimpio responded by in substance confessing that he was indeed the person on the videotapes. Vallely Decl. ¶ 27; D'Amicantonio Decl. ¶¶ 15–16; Crisafi Dep. at 159. According to the defendants, D'Olimpio was handcuffed and arrested, and Crisafi then searched D'Olimpio's car after D'Olimpio consented to such a search. Vallely Decl. ¶¶ 28–29; Crisafi Dep. at 160. D'Olimpio was then placed in the back of Crisafi's car and transported to the 19th Precinct of the New York Police Department in Manhattan. D'Amicantonio Decl. ¶ 17; Vallely Decl. ¶ 30.

In his deposition testimony, D'Olimpio offers a quite different version of events. He testifies that it was only after he requested that the investigators show identification that Crisafi and Vallely briefly flashed their badges. LeBow Decl., Ex. H

(Dep. of Matthew D'Olimpio, 2/22/10 ("D'Olimpio Dep.")), at 38. According to D'Olimpio, the investigators, after inquiring as to what he was doing in Dr. Almonte's office, asked him whether the car that he was approaching belonged to him, and he responded that it was his wife's. *Id.* at 40–41. Although he consented to be frisked by the investigators for weapons, he specifically objected when Crisafi or Vallely (he could not recall who) attempted to search his pockets. *Id.* at 41–42. The investigators who searched D'Olimpio took his car keys from his pocket. *Id.* at 42. The investigators asked whether D'Olimpio would consent to a search of the car, to which he responded, "Absolutely[ ] not." *Id.* Crisafi and/or Vallely nonetheless searched the car. *Id.* The investigators found a brown leather messenger bag in the car and then reached in that bag and pulled out a vial containing Klonopin and Vicodin pills that D'Olimpio was prescribed. *Id.* at 46. Both kinds of pills were in a single bottle labeled for Klonopin. *Id.* at 47. The investigators continued searching the car and then frisked D'Olimpio again and handcuffed him. *Id.* at 50. D'Olimpio testified that at no point did any of the investigators mention anything about a surveillance tape. *Id.* at 49–50. D'Olimpio also denied that Crisafi said anything to him while outside Dr. Almonte's office about knowing how D'Olimpio had obtained his medication, *id.* at 85, or that he at any point confessed or admitted any illegality to Crisafi, *id.* at 84–85.

D'Olimpio testified further as follows: Vallely and Crisafi began questioning him while driving him to the precinct, but did not read him his *Miranda* rights. *Id.* at 53–55. This questioning included, among other things, discussion of D'Olimpio's work for the New York City Civilian Complaint Review Board, which Crisafi referred to as the "rat squad." *Id.* at 54. While in the car, D'Olimpio requested an attorney, but none was provided. *Id.* at 55–56. Upon arriving at the precinct, D'Olimpio, who was still handcuffed, was brought to an interview room for further questioning. *Id.* at 59. Crisafi advised D'Olimpio that he already knew everything that had happened and that D'Olimpio's "best shot" would be to "just admit and throw myself at his mercy." *Id.* at 60. D'Olimpio again requested a lawyer, and also informed Crisafi that he needed to take his medication because he was feeling a panic attack coming on. *Id.* at 63. Crisafi returned with a prescription bottle and gave D'Olimpio a pill, which D'Olimpio swallowed. *Id.* at 63, 70. D'Olimpio asked to go to the bathroom, and upon returning to the interview room, again asked Vallely for a lawyer. *Id.* at 72. Shortly thereafter, D'Olimpio began to feel woozy. *Id.* Crisafi asked D'Olimpio to sign a piece of paper containing his identifying information, and he did so. *Id.* at 75. D'Olimpio testifies that memory of the interview is very hazy after that point. *Id.* After further questioning by Crisafi, D'Amicantonio led D'Olimpio to a holding cell, where D'Olimpio fell asleep. *Id.* at 78.

D'Olimpio woke up several hours later to Crisafi knocking on his cell. *Id.* at 81. D'Olimpio asked for his lawyer, and Crisafi then handcuffed him and led him out of the precinct, indicating that he was taking him to the "tombs" in downtown Manhattan. *Id.* There, he was led into a holding cell with several other prisoners for fourteen to sixteen hours, at which point he was moved to another cell for another ten to twelve hours. *Id.* at 87–90. Eventually, D'Olimpio met with a Legal Aid attorney and went to court, where he was released on his own recognizance. *Id.* at 92–93.

The deposition testimony of D'Amicantonio and Vallely corroborates certain aspects of D'Olimpio's account of the events of November 16. D'Amicantonio testified that shortly after D'Olimpio was put in

Crisafi's car, D'Olimpio told D'Amicantonio that he wanted a lawyer. D'Amicantonio Dep. at 68. D'Amicantonio conveyed that information to Crisafi, who responded, "We didn't have this conversation." *Id.* at 68–69. When the officers arrived at the station, Crisafi requested that D'Amicantonio sit in on the interview, but D'Amicantonio refused because D'Olimpio had invoked his right to counsel. *Id.* at 69–70. Vallely testified that at Crisafi's request, Vallely signed a document purporting to indicate that D'Olimpio had waived his *Miranda* rights, even though Vallely did not in fact witness any such waiver. Vallely Dep. at 180, 186.[4]

On November 17, Vallely met with an Assistant District Attorney ("ADA") at the Manhattan District Attorney's Early Case Assessment Bureau and provided her with paperwork and described the circumstances of D'Olimpio's arrest and booking. Vallely Decl. ¶ 35. The ADA drafted the complaint based on the materials and information that Vallely provided. *Id.* ¶ 36. Vallely then signed the complaint, which charged D'Olimpio with Criminal Impersonation in the Fourth Degree and Criminal Possession of a Controlled Substance in the Seventh Degree. *Id.* Ex. 2. This complaint quotes a purported confession by D'Olimpio to calling in prescriptions for "Norco" to Walgreens under Dr. Plokamakis's name for a patient named James Avery, and then to telling the pharmacist his name was Avery when picking up the prescriptions. D'Olimpio denies admitting to such conduct or to signing a four-page written confession that bears his purported signature. D'Olimpio Dep. at 80, 84–85, 98–100, 102–03.

At an appearance in New York County Criminal Court on February 2, 2010, the District Attorney's Office orally moved to dismiss the criminal case against D'Olimpio. Pl's 56.1 Resp. Crisafi ¶ 41. The motion was granted and the case was dismissed in the "interest of justice." Decl. of Peter S. Hyun, 4/8/10, Exs. 3 (transcript) & 4 (certificate of disposition).

In his complaint, D'Olimpio asserts claims against the Investigator Defendants for numerous violations of his constitutional rights under the Fourth and Fourteenth amendments (the First Cause of Action in the Second Amended Complaint), for malicious prosecution in violation of § 1983 and the Fourth and Fourteenth Amendments (the Second Cause of Action), and for false arrest and unlawful detention in violation of § 1983 and the Fourth and Fourteenth Amendments (the Fourth and Fifth Causes of Action). In their summary judgment motions, these defendants seek dismissal of all the aforementioned claims.

The Investigator Defendants move for summary judgment dismissing the false arrest, unlawful detention, and malicious prosecution claims primarily on the ground that there was probable cause to arrest and prosecute D'Olimpio. Relatedly, the defendants contend that the existence of arguable probable cause entitles them to qualified immunity with respect their arrest and prosecution of D'Olimpio.

 It is well settled that the existence of probable cause is a complete defense to claims of false arrest and malicious prosecution under § 1983. *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir.

---

4. Additionally, in connection with a subsequent disciplinary charges brought by the Department of Health, Vallely assented to a stipulation drafted by his attorney admitting that on November 16, 2007, Vallely signed as a witness a witness statement purportedly given by D'Olimpio, with knowledge that this statement would be presented to the Manhattan District Attorney's Office, even though Vallely was not present when that statement was written. Vallely Dep. at 182–83. In his deposition, however, Vallely claims that he was in fact present when D'Olimpio gave this witness statement. *Id.* at 180, 186.

2007); *Bonide Prods., Inc. v. Cahill,* 223 F.3d 141, 145 (2d Cir.2000).

> "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." The probable cause determination is based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause."

*D'Olimpio I,* 718 F.Supp.2d 334, 348–49, 2010 WL 2428128, at *7 (S.D.N.Y. June 15, 2010) (citations omitted). "Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002). However, it remains the rule that "resolution of genuine factual issues is inappropriate on motions for summary judgment based on qualified immunity." *McClellan v. Smith,* 439 F.3d 137, 149 (2d Cir.2006).

In considering whether the Investigator Defendants had arguable probable cause to arrest D'Olimpio, the Court's inquiry is confined to "the facts known by the arresting officer[s] at the time of the arrest." *Jaegly v. Couch,* 439 F.3d 149, 153 (2d Cir.2006). If these facts would not support a determination of arguable probable cause, the officer's subjective belief that he had probable cause is irrelevant. *Id.* at 154.[5] Thus, probable cause must be measured by the objective facts that Crisafi and Vallely knew when they saw D'Olimpio exiting Dr. Almonte's office.[6]

■ For the following reasons, the Court concludes that the basis for these investigators' identifications of D'Olimpio as "James Avery" consists of a number of disputed facts and other matters not fit for resolution on summary judgment. If these disputed facts were taken in the officers' favor, those facts might well lead a reasonable officer to objectively conclude that probable cause existed. But for purposes of the instant motion, the Court must view all facts in the light most favorable to D'Olimpio, and as such, the undisputed factual record does not compel the conclusion that arguable probable cause existed.

---

**5.** Because of the objective nature of the probable cause analysis, the Court disregards the testimony in the record that pertains only to the investigators' subjective belief as to whether probable cause existed. *See, e.g.,* D'Amicantonio Aff. ¶ 9 ("Based on what Sr. Inv. Crisafi related to me in the car [on the way over to Dr. Almonte's office] I was confident that we had probable cause to proceed."); Vallely Dep. at 159–60 (testifying that he believed that the investigators lacked probable cause to arrest D'Olimpio until the point when D'Olimpio allegedly confessed to calling in the prescriptions).

**6.** On the defendants' version of the facts, the search of D'Olimpio's car, which turned up the bottle containing Klonopin and Vicodin,

took place after D'Olimpio was arrested. Vallely Decl. ¶¶ 28–29. Thus, the defendants do not rely on the fruits of that search as relevant to forming the probable cause for D'Olimpio's arrest. Furthermore, while the defendants all assert that D'Olimpio blurted out a confession to being the person on the surveillance tapes shortly after being approached by the investigators, D'Olimpio testified in his deposition that he did not recall making any such statement, and this testimony must be credited for purposes of summary judgment. Finally, D'Amicantonio's knowledge is not relevant to the existence of probable cause, as D'Amicantonio did not view any of the surveillance tapes or have any knowledge of the investigation independent from his briefing by Crisafi.

As an initial matter, it is axiomatic that "[r]esolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). The credibility of Crisafi and Vallely, the only two officers who allegedly observed footage of "Avery," is very much at issue in this case, and other aspects of the summary judgment record place their veracity in question. Vallely has admitted to representing that he witnessed a *Miranda* form purportedly signed by D'Olimpio even though he was not present when the asserted waiver of rights was made by D'Olimpio. And Crisafi has been accused of, among other things, repeatedly denying D'Olimpio's request for counsel and then asking D'Amicantonio to lie about it; giving D'Olimpio a pill that he was not prescribed; and forging or otherwise wrongfully inducing D'Olimpio's signature on multiple confessions. Because the existence of probable cause rests so heavily on the investigators' testimony, the facts in the record raising doubts as to the truth of this testimony present an independent reason to deny summary judgment on this issue.

Moreover, even if the testimony of Crisafi and Vallely as to their identifications from the surveillance tape were assumed to be accurate, a reasonable jury could still find that arguable probable cause did not exist, because taking the facts most favorably to D'Olimpio, each step of the officers' purported identifications of D'Olimpio as Avery is questionable. For example, although Vallely has asserted that he independently recognized D'Olimpio as the person he saw on the surveillance tape when Vallely viewed this footage at the Walgreens, the pharmacist who was on duty at the time that "Avery" picked up the prescription was not present to identify which of several customers that Vallely viewed was in fact Avery. Moreover,

Vallely testified that before seeing D'Olimpio emerge from the office, Valentine not only told him that D'Olimpio was about to leave the building, but also reminded Vallely of D'Olimpio's physical description, including what he was wearing. Vallely communicated these facts to the other investigators and even admitted that he would not have recognized D'Olimpio if he had not gotten the description of his clothing from Valentine. For these reasons, a rational jury could doubt that Vallely's purported identification had any value as an objective basis to believe that D'Olimpio had committed a crime, and could instead conclude that the investigators' asserted independent identification of D'Olimpio as "Avery" was tainted by the information about D'Olimpio given to Vallely by Valentine.

Similarly, for purposes of summary judgment, the affidavits of Dr. Almonte and Valentine do not merit any significant independent weight in establishing the existence of probable cause. While there can be no dispute that these individuals told the investigators that the generic verbal description of "James Avery" matched Crisafi, they did not see the surveillance footage themselves, and the description offered to them by Crisafi was vague to the point of meaninglessness. To be sure, there are repeated mentions in the record of D'Olimpio's and Avery's "sideburns," which some of the affiants have mentioned were "distinctive" or "noticeable." But what is lacking in the record is any clear explanation in the affidavits or deposition testimony about what made these sideburns so worthy of mention or how this characteristic meaningfully narrowed the description of a white male with dark hair and medium build. *See, e.g.*, Vallely Dep. at 83 ("Q: What kind of sideburns is [Crisafi] talking about [in his description of Avery]? A: I believe there were sideburns down to—in the ear area."); Crisafi

Dep. at 153 ("For some reason, what sticks out in my head about this Avery guy ... was that he had sideburns. I don't know why that sticks in my head, but that's one of the things that seemed to stick in my head."); D'Amicantonio Dep. at 64 (describing D'Olimpio as having "black hair and sideburns"). Furthermore, the identification made by Dr. Almonte has dubious independent weight, given that in the version of the facts most favorable to plaintiff, Dr. Almonte responded to a description given to him by Valentine after Valentine had already told the investigators that their description fit D'Olimpio. In sum, a rational jury could readily find that the identifications made by Dr. Almonte and Valentine based on these vague descriptions had little to no value in leading a reasonable officer to believe that D'Olimpio had committed a crime. *Cf. Grant v. City of Long Beach*, 315 F.3d 1081, 1088 (9th Cir.2002) ("[M]ere resemblance to a general description is not enough to establish probable cause.").

While the defendants attempt to support their argument in this respect by citing a number of cases finding probable cause to arrest based on surveillance footage and eyewitness identifications, these holdings involve evidence far less equivocal than what is present in this summary judgment record. For example, defendants rely heavily on *Dawson v. Snow*, 356 Fed.Appx. 526 (2d Cir.2009), a non-precedential summary order affirming a district court's decision to grant summary judgment to defendants on a false arrest claim because probable cause existed. The crime suspected in that case was the theft of a ladder, and the officers based their decision to arrest on accounts from two eyewitnesses to the crime, one of whom indicated that he saw two men steal an orange ladder from his father's truck, and another of whom said that shortly thereafter, he saw two men speed away from the parking lot with an orange ladder in their vehicle. The next morning, that second eyewitness identified two suspects as the perpetrators and stated to the police officer that he was " '100% sure' that the men he saw that morning were the same ones he had seen speeding out of the parking lot the day before," and thereafter, the witness confirmed that identification in a sworn statement. *Id.* at 528. Thus, even if it were intended as precedent-which it expressly is not—*Dawson* is distinguishable both because it rested on direct testimony from an eyewitness (rather than the subsequent viewing of surveillance tapes) and because there was no suggestion in the record of that case that there was any reason to doubt the credibility of the eyewitnesses.[7]

7. Similarly, Crisafi relies on New York state cases involving crimes relating to prescription drugs where a probable cause finding was based in part on a pharmacist's identification, but the officers in those cases had a factual basis for probable cause that goes beyond the record here. *See People v. Orlando*, 56 N.Y.2d 441, 444, 452 N.Y.S.2d 559, 438 N.E.2d 92 (N.Y.1982) (finding probable cause to arrest and search arrestee's car when arrestee confessed to police that he had brought in forged prescriptions and had other prescriptions and drugs in his car); *People v. Fowler*, 194 A.D.2d 551, 598 N.Y.S.2d 320 (2d Dep't 1993) (same where police arrived at pharmacy shortly after pharmacist reported that he had been given a forged prescription and police found outside the pharmacy a person fitting the description given by the pharmacist). Crisafi also cites certain cases for the proposition that probable cause can exist even when the identification comes solely from a description based on a viewing of surveillance tapes. This may be true in certain circumstances, but the cited cases either lack detail about the contents of the footage held to support probable cause, *see People v. McGowan*, 291 A.D.2d 296, 737 N.Y.S.2d 608 (1st Dep't 2002), or involve far more evidence supporting the identification than what is present on this record, *see, e.g., Edwards v. Pretsch*, 180 F.Supp.2d 499, 507–08 (S.D.N.Y.2002).

In sum, while a fact-finder could ultimately conclude from the record here that the officers had probable cause to arrest D'Olimpio, that conclusion would require the weighing of evidence and assessments of credibility, which go beyond the sorts of determinations that the Court may make in ruling on motions for summary judgment. *See, e.g., Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). For these reasons, the defendants are not entitled to summary judgment on the ground that the investigators had arguable probable cause to arrest D'Olimpio.

■ Turning next to D'Olimpio's malicious prosecution claim under § 1983, such a claim can proceed only if the plaintiff can make out the elements of this tort under New York State law, which are "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of N.Y.,* 612 F.3d 149, 161 (2d Cir.2010) (internal quotation marks omitted).

Taking the latter two elements first, the defendants are not entitled to summary judgment on these grounds for substantially the reasons that summary judgment cannot be granted on arguable probable cause to arrest. To be sure, for purposes of malicious prosecution, the relevant determination of probable cause is not whether there was probable cause to arrest, but whether there was probable cause "to believe that [the arrestee] could be successfully prosecuted." *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 417 (2d Cir.1999). But here, the defendants do not argue that the latter of sort of probable cause could be present even if probable cause to arrest were lacking, and there would in any event be no basis for any such argument. And for purposes of summary judgment, the element of malice may be inferred from the lack of probable cause. *See Ricciuti v. N.Y. City Trans. Auth.,* 124 F.3d 123, 131 (2d Cir.1997).

The defendants, however, argue that they are still entitled to summary judgment because of plaintiff's failure to establish the other two elements of the malicious prosecution tort. Specifically, they assert that D'Olimpio can show neither that the prosecution terminated in D'Olimpio's favor or that the defendants "initiated" the prosecution. As to the former element, the defendants contend that the dismissal of the criminal charges against D'Olimpio "in the interest of justice" does not constitute a favorable termination and that the malicious prosecution claim fails for this reason alone. In support of this proposition, they rely on the case of *Hygh v. Jacobs,* 961 F.2d 359 (2d Cir.1992), which held that, under New York law, such a dismissal "cannot provide the favorable termination required as the basis for a claim of malicious prosecution," *id.* at 368 (citing New York state cases). Since *Hygh* was decided, however, the New York Court of Appeals has clarified that there is no "per se rule that a dismissal in the interest of justice can never constitute a favorable termination. Rather, ... the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused." *Cantalino v. Danner,* 96 N.Y.2d 391, 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (2001). Thus, when charges are dismissed "because they were groundless-not out of mercy or compassion," the favorable termination element is satisfied. *Id.* at 397, 729 N.Y.S.2d 405, 754 N.E.2d 164. Here, there are no facts in the record indicating that the termination of the criminal charges was inconsistent with D'Olimpio's innocence; rather, D'Olimpio has testified that several of the documents underlying the initiation of his prosecution were

forged and/or false. Thus, summary judgment is not warranted on this ground. *See, e.g., Rounseville v. Zahl,* 13 F.3d 625, 629 (2d Cir.1994) ("when the grounds for the dismissal of a criminal proceeding are unclear, New York courts consider whether the proceeding was terminated in plaintiff's favor to be a question of fact that prevents summary judgment").

As to the remaining element, Crisafi and Vallely claim for the first time in their *reply* briefs that they did not "initiate" the charges against D'Olimpio. Assuming *arguendo* that these defendants have not waived this argument by failing to include it in their opening briefs, it is in any event unavailing, as there is evidence in the record that Crisafi and Vallely variously forged and falsely witnessed documents that were forwarded to the ADA and that formed the basis of his prosecution. In addition, it is undisputed that Vallely signed the criminal complaint. These actions, when taken by police officers, amount to "initiation." *See, e.g., Llerando–Phipps v. City of N.Y.,* 390 F.Supp.2d 372, 382–83 (S.D.N.Y.2005) ("In malicious prosecution cases against police officers, plaintiffs have met this first element by showing that officers brought formal charges and had the person arraigned, or filled out complaining and corroborating affidavits, or swore to and signed a felony complaint." (citation omitted)); *see also Manganiello,* 612 F.3d at 163 ("A jury may permissibly find that a defendant initiated a prosecution where he "fil[ed] the charges" or "prepar[ed] an] alleged false confession and forward[ed] it to prosecutors." " (alterations in original) (quoting *Ricciuti,* 124 F.3d at 130)). Thus, D'Olimpio has made a showing on this element

that is sufficient to survive summary judgment.[8]

For these reasons, the Court denies the defendants' motions for summary judgment on the malicious prosecution claims.

The claims for false arrest, unlawful detention, and malicious prosecution are not the only claims D'Olimpio brings against the Investigator Defendants. In his First Cause of Action, D'Olimpio alleges that Crisafi, Vallely, and D'Amicantonio committed several other violations of his rights under the First and Fourteenth Amendment in that they:

(A) intentionally and willfully arrested D'Olimpio without probable cause or a warrant and based on false justifications, (B) knowingly provided false testimony in an affidavit that led to D'Olimpio's arraignment on false charges, (C) questioned D'Olimpio and presented D'Olimpio with a confession when D'Olimpio had not spoken with an attorney despite his repeated requests for one, (D) falsely claimed that D'Olimpio had received his *Miranda* rights when he had not, (E) provided D'Olimpio with a narcotic medication that intoxicated D'Olimpio in such a manner as to endanger his safety in a prison situation, (F) induced D'Olimpio to sign the One–Page Confession while D'Olimpio was under the influence of that narcotic medication, (G) forged D'Olimpio's signature on the Four–Page Confession, (H) forged D'Olimpio's signature on a Miranda Sheet, and (I) denied D'Olimpio access to his medication after his arrest.

Second Amended Compl. ¶ 112. Although the defendants purport to move for summary judgment dismissing the complaint in its entirety, their briefing fails to ad-

---

**8.** Although there appears to be little evidence that D'Amicantonio played any role in "initiating" the prosecution, the defendants do not argue in their briefs that the malicious prose-

cution claim should be dismissed against him on this ground. Accordingly, the Court does not reach that issue.

dress certain of the wrongs alleged in this paragraph of the complaint, including in particular his claims relating to Crisafi's provision of the narcotic pill. Indeed, the defendants' opening briefs are entirely silent as to these claims though in their reply briefs the defendants do specifically request summary judgment dismissing this claim insofar as it alleges that the defendants searched D'Olimpio's car in violation of the Fourth Amendment and that D'Olimpio's Fifth Amendment or *Miranda* rights were violated.

With respect to the claim relating to the allegedly unlawful search of the car, the defendants contend that D'Olimpio impermissibly raises this claim for the first time in his memorandum in opposition to summary judgment. But the first count of his complaint alleges violations of D'Olimpio's Fourth Amendment rights, and the factual allegations in the complaint, which are incorporated by reference in the first cause of action, clearly allege that D'Olimpio refused to consent to the search of the car. *Id.* ¶ 35. Waiver aside, the defendants seek dismissal of this claim only on the ground that the warrantless search of the vehicle was permissible because probable cause existed for D'Olimpio's arrest. Because the Court, for the reasons stated above, concludes that the defendants are not entitled to summary judgment based on probable cause to arrest, this Fourth Amendment claim may proceed to trial.[9]

■ The analysis is different with respect to D'Olimpio's claims based on the Fifth Amendment and/or violations of his *Miranda* rights. The defendants correctly

note that D'Olimpio has denied making any confessions or otherwise incriminating himself during his interactions with the officers. In order to bring a § 1983 claim based on such violations, a plaintiff must show that his privilege against self-incrimination was violated, and such a violation cannot be shown where that plaintiff denies making any inculpatory statements that were used against him in a criminal proceeding. *See Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir.1998). For this reason, the Court grants the defendants' motions for summary judgment insofar as D'Olimpio's First Cause of Action rests on allegations that his Fifth Amendment rights were violated.

■ Turning next to the summary judgment motion of Nadel, Moffett, and Giglio (the "Supervisor Defendants"), the pertinent facts are as follows. At times relevant to this action, Nadel was the Regional Program Director for the BNE–MARO, a position to which he was appointed in May 2007. Pl's 56.1 Resp. Vallely ¶ 14. In 2007, Nadel was directly supervised by Patsy Jones, and also reported to Moffett, the Section Chief of the narcotics enforcement division of the BNE, and to Giglio, the BNE's Director, both of whom worked out of the BNE's Troy, New York central office. *Id.* ¶¶ 14–15. Nadel's responsibilities as Program Director included preventing the diversion of controlled substances, as well as managerial and administrative oversight with respect to the MARO and communication with the central office. *Id.* ¶¶ 16–17. Nadel attests that Crisafi su-

---

**9.** Vallely and D'Amicantonio mention in a footnote that D'Olimpio's opposition brief never claims that Vallely or D'Amicantonio (as opposed to Crisafi) searched the vehicle or acquired any fruits of that search. Vallely *et al.* Reply Mem., 4/30/10, at 10 n. 16. Even if the Court were to construe this footnote as a motion to dismiss the Fourth Amendment claim against these two defendants, summary

judgment would be inappropriate because D'Olimpio has not had an opportunity to respond to such a motion, and in any event, there exist disputed issues of fact as to the circumstances of the search, such as whether it took place before or after D'Olimpio's arrest and the extent to which Vallely and D'Amicantonio were involved.

pervised all MARO investigators starting in 2007 and as a result, that Nadel was not involved in day-to-day aspects of investigations. *Id.* ¶ 91.

Moffett was the BNE Section Chief and reported directly to Giglio. *Id.* ¶¶ 18–19. Moffett's duties included training and serving as a liaison for the various program directors and communicating with investigators regarding certain cases that required his involvement. *Id.* ¶ 20. Moffett was personally involved only in a handful of investigations at a time, and did not involve himself in day-to-day aspects of routine investigations. *Id.* ¶¶ 92–93. However, in 2007, Moffett spoke to Nadel on a daily basis regarding the operations of the MARO, and frequently communicated with Crisafi regarding certain investigations. *Id.* ¶ 94.

Giglio served as the BNE's statewide director until his retirement in November 2008. His responsibilities included oversight of the Bureau's narcotics enforcement and diversion prevention functions. *Id.* ¶¶ 22. He generally had limited involvement in BNE investigations and cases. *Id.* ¶ 96.

Nadel and Moffett became aware of D'Olimpio's arrest when Vallely sent them an e-mail on November 19, 2007, pursuant to standard procedures applicable whenever an arrest was made. *Id.* ¶ 95. Neither Nadel, Moffett, or Giglio had any involvement in the investigation and subsequent prosecution of D'Olimpio. *Id.* ¶ 99.

With one exception that is discussed below, D'Olimpio's evidence in opposition to these defendants' motion consists entirely of excerpts from the defendants' deposition testimony. In particular, D'Olimpio relies on: (1) Vallely's testimony that prior to D'Olimpio's arrest, he did not receive training regarding *Miranda* warnings; (2) Vallely's testimony that when Nadel became Program Director, he established a chain of command that prevented investi-gators from communicating with the central office unless they had first spoken with Nadel; (3) Vallely's testimony that Crisafi had a gruff demeanor; (4) Moffett's testimony that Crisafi could be obstinate and was a bully; (5) Moffett's testimony that Crisafi had a problem with authority; (6) Moffett's testimony that investigators had expressed dismay with Crisafi's performance as their supervisor and that he and Giglio were aware of such complaints; and (7) Moffett's testimony that there was a disconnect between MARO and the central office between 2007 and 2008. *Id.* ¶¶ 86–87, 91.

In the Second Cause of Action in his complaint, D'Olimpio asserts that the Supervisor Defendants are liable for the alleged constitutional violations under a number of theories of supervisory liability. To succeed in asserting such claims, D'Olimpio must demonstrate, among other things, that Nadel, Moffett, and Giglio were each personally involved in the constitutional violations alleged. Under Second Circuit precedent, a supervisor's personal involvement may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[10]

Several of these potential bases for supervisory liability find no support in the record. It is undisputed that the Supervisor Defendants did not directly participate in D'Olimpio's arrest and prosecution. And while D'Olimpio's complaint makes much of an alleged BNE–MARO policy of permitting suspects to be arrested based merely on physicians' unauthenticated denials of having called in a prescription suspected to be fraudulent, there is nothing in the summary judgment record indicating that such a policy led to D'Olimpio's arrest or even existed in the first place. In the end, the gist of D'Olimpio's remaining allegations of supervisory liability is that the Supervisor Defendants failed to supervise Crisafi and that this failure caused the violation of D'Olimpio's constitutional rights.

If the only evidence for D'Olimpio's supervisory liability claim consisted of those aspects of the defendants' deposition testimony summarized above, the Supervisor Defendants would likely be entitled to qualified immunity, if not summary judgment on the merits. *See, e.g., Poe v. Leonard,* 282 F.3d 123, 146 (2d Cir.2002) (holding that in order for a supervisor asserting a qualified immunity defense to be liable under § 1983 for failure to supervise, the plaintiff must show that the supervisor "knew or should have known that there was a high degree of risk" that the subordinate officer would commit the constitutional violation at issue, "but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk," that "that failure caused a constitutional injury," and that the supervisor's conduct was "objectively unreasonable"). However, D'Olimpio has presented additional evidence of defendants' failure to supervise in the form of a report by the New York State Inspector General dated November 28, 2008 and entitled "Investigation of Employee Misconduct at the New York State Department of Health Bureau of Narcotics Enforcement." LeBow Decl., Ex. G (the "Report").

As the Court noted in ruling on the Supervisor Defendants' motion to dismiss, the Report specifically discusses the circumstances of D'Olimpio's investigation and arrest and concludes that this and other incidents evidenced a lack of supervision of Crisafi and the MARO. *See D'Olimpio I,* 718 F.Supp.2d at 347–48, 2010 WL 2428128, at *6. The Report, in addition to detailing various acts of misconduct by Crisafi and an impropriety committed by Vallely,[11] describes the general lack of law

---

**10.** The Supervisor Defendants argue in their summary judgment briefs that these traditional bases for supervisory liability have been sharply curtailed by the Supreme Court's decision in *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). For the same reasons that the Court rejected this argument in the context of the defendants' motion to dismiss, *see D'Olimpio I,* 718 F.Supp.2d at 345–48, 2010 WL 2428128, at *4–6, the Court concludes that *Colon* sets forth the appropriate standards for determining the supervisory liability claim here alleged.

**11.** As to Crisafi, the Report concludes, among other things, that during the time period relevant to this action, he (1) falsified information on his employment application; (2) abused his state-issued parking placard; (3) outfitted his official vehicle with lights and sirens without permission; (4) incurred numerous unpaid parking summonses; (5) used prescription narcotic substances while on duty; (6) was engaged in unapproved outside employment; and (7) failed to report the accidental discharge of a firearm while on duty. Report at 5–13. Furthermore, the Report notes that on August 31, 2007, after Crisafi and Vallely arrested a different suspect for attempting to illegally obtain controlled substances, that suspect declined to give a statement and asked to speak to an attorney, a fact that Vallely noted on the *Miranda* sheet. "When Vallely informed Crisafi that the suspect did not wish to give a statement, Crisafi replied,

enforcement experience among MARO investigators, and, in particular, concludes that the BNE failed to conduct full background checks on investigators or verify their eligibility and suggests that Moffett and John Russell (a former MARO director) knew that Crisafi used narcotics while at work. Further, the Report's section entitled "Lack of Supervision of Crisafi and MARO" notes the divide between MARO and the central office; the "autonomy" and "bizarre dynamic" characteristic of MARO's operations; Nadel's lack of prior law enforcement experience; Crisafi's ability to attain "an inappropriate degree of power within the office"; a high rate of turnover among MARO employees; Crisafi's arrogant and bullying personality; and the lack of policy direction from the BNE. Report at 16–17. The Report closes by recommending disciplinary action against Crisafi, as well as more direct control over MARO by the central office, improved training, and improved background check procedures for hiring investigators. *Id.* at 17–18. These conclusions, to the extent that they are admitted into evidence and credited by the fact-finder, tend to establish the sorts of facts that together might lead a rational jury to conclude that there was an actionable failure to supervise.

In a footnote in their reply brief, the Supervisor Defendants object for the first time to the admissibility of the Inspector General's Report "due to its irrelevance, prejudicial value, and since it contains double hearsay." Vallely *et al.* Reply Mem., 4/30/10, at 13 n. 19. These objections lack merit. The Report is clearly relevant, as its discussion of the failure to supervise the MARO directly tends to prove facts relating to the Supervisor Defendants' liability. Fed.R.Evid. 401. As to prejudice, the Court is at present not convinced that the danger of unfair prejudice from admitting selected portions of the Report substantially outweighs the Report's probative value, and the defendants fail to identify with any specificity those aspects of the report that they believe are unfairly prejudicial. Finally, even if the Report contains or is based on hearsay or double hearsay, Federal Rule of Evidence 803(8)(C) specifically excludes from the hearsay rule "reports ... of public offices or agencies ... setting forth ... in civil actions ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The Report was generated using a methodology that on its face appears to be reliable,[12] and the defendants

---

in reference to the Miranda sheet, 'Get rid of that paper; this didn't happen,' " and then *proceeded to attempt to take a statement from* that suspect, who again requested an attorney. *Id.* at 15–16. As to Vallely, the report concluded that he should have recognized that Crisafi's request that he falsely witness D'Olimpio's *Miranda* warnings was improper. *Id.* at 17. These findings provide an additional reason why the issue of the Investigator Defendants' probable cause to arrest and prosecute D'Olimpio, which turns almost exclusively on the testimony of Crisafi and Vallely, implicates the sorts of credibility assessments that must be made by a jury following trial.

**12.** The Report's "Methodology" section states as follows:

The Inspector General interviewed Louis Crisafi and numerous other employees of BNE, including all of the investigators currently employed in MARO. The Inspector General also interviewed the Director of BNE James Giglio, BNE Chief of Investigations Michael Moffett, the past and current Program Directors of MARO, past employees of MARO, and the investigator responsible for firearms training for the bureau. The Inspector General reviewed all existing policies and procedures currently guiding the conduct of BNE investigators as well as documentation pertaining to several arrests executed by Crisafi. The Inspector General also contacted police officers and district attorneys who had interacted with Crisafi in the course of his work as a BNE investigator.

have identified no indications that the report is not trustworthy. Thus, for present purposes and subject to reconsideration at trial, the Court determines that the conclusions of the report are admissible under the hearsay exception set forth in Rule 803(8)(C). *Cf. Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir.1991) (affirming district court's decision in a § 1983 action to admit selected portions of report of a New York State investigation concluding that a county police department and district attorney's office "systematically failed over a period of years adequately to investigate and to discipline cases of employee misconduct that had been brought to their attention"); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir.2000) (Rule 803(8)(C) "renders presumptively admissible 'not merely ... factual determinations in the narrow sense, but also ... conclusions or opinions that are based upon a factual investigation.'" (quoting *Gentile*, 926 F.2d at 148)).

As the Court noted in its ruling on the motion to dismiss, "[t]hese findings by the Inspector General strongly suggest that [the Supervisor Defendants] 'fail[ed] to act on information indicating unconstitutional acts were occurring,' or were 'gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts,'" and also demonstrate "'an affirmative causal link between the supervisor's inaction and [plaintiff's] injury.'" *D'Olimpio I*, 718 F.Supp.2d at 348, 2010 WL 2428128, at *6 (alterations in original) (quoting *Poe*, 282 F.3d at 140). Moreover, a reasonable jury could conclude, based on the Report and the other evidence in the record, that the conduct of each of Nadel, Giglio, and Moffett was objectively unreasonable. For these reasons, the Court hereby denies these defendants' motions for summary judgment.

Report at 4.

For the foregoing reasons, the Court hereby denies the defendants' summary judgment motions in full, except that the Court grants the motions of the defendants for summary judgment dismissing so much of the First Cause of Action as alleges that the defendants violated D'Olimpio's Fifth Amendment privilege against self-incrimination. The Clerk of the Court is directed to close the documents numbered 59 and 60 on the docket of this case. The parties are reminded that the trial on all remaining claims is firmly set to begin on January 10, 2011.

SO ORDERED.